# BOND *v.* UNITED STATES

No. 98–9349.   Argued February 29, 2000—Decided April 17, 2000

REHNQUIST, C. J., delivered the opinion of the Court, in which STEVENS, O'CONNOR, KENNEDY, SOUTER, THOMAS, and GINSBURG, JJ., joined. BREYER, J., filed a dissenting opinion, in which SCALIA, J., joined, *post*, p. 339.

*M. Carolyn Fuentes* argued the cause for petitioner. With her on the briefs were *Lucien B. Campbell* and *Henry J. Bemporad.*

*Jeffrey A. Lamken* argued the cause for the United States. With him on the brief were *Solicitor General Waxman, Assistant Attorney General Robinson,* and *Deputy Solicitor General Dreeben.**

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

This case presents the question whether a law enforcement officer's physical manipulation of a bus passenger's carry-on luggage violated the Fourth Amendment's proscription against unreasonable searches. We hold that it did.

Petitioner Steven Dewayne Bond was a passenger on a Greyhound bus that left California bound for Little Rock, Arkansas. The bus stopped, as it was required to do, at the permanent Border Patrol checkpoint in Sierra Blanca, Texas. Border Patrol Agent Cesar Cantu boarded the bus to check the immigration status of its passengers. After reaching the back of the bus, having satisfied himself that the passengers were lawfully in the United States, Agent Cantu began walking toward the front. Along the way, he squeezed the soft luggage which passengers had placed in the overhead storage space above the seats.

---

*Briefs of *amici curiae* urging reversal were filed for the National Association of Criminal Defense Lawyers et al. by *William J. Mertens* and *Barbara Bergman;* and for the Pro Bono Criminal Assistance Project by *David L. Heilberg.*

*Stephen R. McSpadden* filed a brief for the National Association of Police Organizations as *amicus curiae* urging affirmance.

Petitioner was seated four or five rows from the back of the bus. As Agent Cantu inspected the luggage in the compartment above petitioner's seat, he squeezed a green canvas bag and noticed that it contained a "brick-like" object. Petitioner admitted that the bag was his and agreed to allow Agent Cantu to open it.[1] Upon opening the bag, Agent Cantu discovered a "brick" of methamphetamine. The brick had been wrapped in duct tape until it was oval-shaped and then rolled in a pair of pants.

Petitioner was indicted for conspiracy to possess, and possession with intent to distribute, methamphetamine in violation of 84 Stat. 1260, 21 U. S. C. § 841(a)(1). He moved to suppress the drugs, arguing that Agent Cantu conducted an illegal search of his bag. Petitioner's motion was denied, and the District Court found him guilty on both counts and sentenced him to 57 months in prison. On appeal, he conceded that other passengers had access to his bag, but contended that Agent Cantu manipulated the bag in a way that other passengers would not. The Court of Appeals rejected this argument, stating that the fact that Agent Cantu's manipulation of petitioner's bag was calculated to detect contraband is irrelevant for Fourth Amendment purposes. 167 F. 3d 225, 227 (CA5 1999) (citing *California* v. *Ciraolo*, 476 U. S. 207 (1986)). Thus, the Court of Appeals affirmed the denial of the motion to suppress, holding that Agent Cantu's manipulation of the bag was not a search within the meaning of the Fourth Amendment. 167 F. 3d, at 227. We granted certiorari, 528 U. S. 927 (1999), and now reverse.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." A traveler's personal luggage is clearly an "effect" protected by the Amendment. See *United States* v.

---

[1] The Government has not argued here that petitioner's consent to Agent Cantu's opening the bag is a basis for admitting the evidence.

*Place,* 462 U. S. 696, 707 (1983). Indeed, it is undisputed here that petitioner possessed a privacy interest in his bag.

But the Government asserts that by exposing his bag to the public, petitioner lost a reasonable expectation that his bag would not be physically manipulated. The Government relies on our decisions in *California* v. *Ciraolo, supra,* and *Florida* v. *Riley,* 488 U. S. 445 (1989), for the proposition that matters open to public observation are not protected by the Fourth Amendment. In *Ciraolo,* we held that police observation of a backyard from a plane flying at an altitude of 1,000 feet did not violate a reasonable expectation of privacy. Similarly, in *Riley,* we relied on *Ciraolo* to hold that police observation of a greenhouse in a home's curtilage from a helicopter passing at an altitude of 400 feet did not violate the Fourth Amendment. We reasoned that the property was "not necessarily protected from inspection that involves no physical invasion," and determined that because any member of the public could have lawfully observed the defendants' property by flying overhead, the defendants' expectation of privacy was "not reasonable and not one 'that society is prepared to honor.'" See *Riley, supra,* at 449 (explaining and relying on *Ciraolo*'s reasoning).

But *Ciraolo* and *Riley* are different from this case because they involved only visual, as opposed to tactile, observation. Physically invasive inspection is simply more intrusive than purely visual inspection. For example, in *Terry* v. *Ohio,* 392 U. S. 1, 16–17 (1968), we stated that a "careful [tactile] exploration of the outer surfaces of a person's clothing all over his or her body" is a "serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly." Although Agent Cantu did not "frisk" petitioner's person, he did conduct a probing tactile examination of petitioner's carry-on luggage. Obviously, petitioner's bag was not part of his person. But travelers are particularly concerned

about their carry-on luggage; they generally use it to transport personal items that, for whatever reason, they prefer to keep close at hand.

Here, petitioner concedes that, by placing his bag in the overhead compartment, he could expect that it would be exposed to certain kinds of touching and handling. But petitioner argues that Agent Cantu's physical manipulation of his luggage "far exceeded the casual contact [petitioner] could have expected from other passengers." Brief for Petitioner 18–19. The Government counters that it did not.

Our Fourth Amendment analysis embraces two questions. First, we ask whether the individual, by his conduct, has exhibited an actual expectation of privacy; that is, whether he has shown that "he [sought] to preserve [something] as private." *Smith* v. *Maryland,* 442 U. S. 735, 740 (1979) (internal quotation marks omitted). Here, petitioner sought to preserve privacy by using an opaque bag and placing that bag directly above his seat. Second, we inquire whether the individual's expectation of privacy is "one that society is prepared to recognize as reasonable." *Ibid.* (internal quotation marks omitted).[2] When a bus passenger places a bag in an overhead bin, he expects that other passengers or bus employees may move it for one reason or another. Thus, a bus passenger clearly expects that his bag may be handled. He does not expect that other passengers or bus employees will,

---

[2] The parties properly agree that the subjective intent of the law enforcement officer is irrelevant in determining whether that officer's actions violate the Fourth Amendment. Brief for Petitioner 14; Brief for United States 33–34; see *Whren* v. *United States,* 517 U. S. 806, 813 (1996) (stating that "we have been unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual officers"); *California* v. *Ciraolo,* 476 U. S. 207, 212 (1986) (rejecting respondent's challenge to "the authority of government to observe his activity from any vantage point or place if the viewing is motivated by a law enforcement purpose, and not the result of a casual, accidental observation"). This principle applies to the agent's acts in this case as well; the issue is not his state of mind, but the objective effect of his actions.

as a matter of course, feel the bag in an exploratory manner. But this is exactly what the agent did here. We therefore hold that the agent's physical manipulation of petitioner's bag violated the Fourth Amendment.

The judgment of the Court of Appeals is

*Reversed.*

JUSTICE BREYER, with whom JUSTICE SCALIA joins, dissenting.

Does a traveler who places a soft-sided bag in the shared overhead storage compartment of a bus have a "reasonable expectation" that strangers will not push, pull, prod, squeeze, or otherwise manipulate his luggage? Unlike the majority, I believe that he does not.

Petitioner argues—and the majority points out—that, even if bags in overhead bins are subject to general "touching" and "handling," this case is special because "Agent Cantu's physical manipulation of [petitioner's] luggage 'far exceeded the casual contact [he] could have expected from other passengers.'" *Ante*, at 338. But the record shows the contrary. Agent Cantu testified that border patrol officers (who routinely enter buses at designated checkpoints to run immigration checks) "conduct an inspection of the overhead luggage by squeezing the bags as we're going out." App. 9. On the occasion at issue here, Agent Cantu "felt a green bag" which had "a brick-like object in it." *Id.*, at 10. He explained that he felt "the edges of the brick in the bag," *id.*, at 12, and that it was a "[b]rick-like object . . . that, when squeezed, you could feel an outline of something of [a] different mass inside of it," *id.*, at 11. Although the agent acknowledged that his practice was to "squeeze [bags] very hard," he testified that his touch ordinarily was not "[h]ard enough to break something inside that might be fragile." *Id.*, at 15. Petitioner also testified that Agent Cantu "reached for my bag, and he shook it a little, and squeezed it." *Id.*, at 18.

How does the "squeezing" just described differ from the treatment that overhead luggage is likely to receive from strangers in a world of travel that is somewhat less gentle than it used to be? I think not at all. See *United States* v. *McDonald*, 100 F. 3d 1320, 1327 (CA7 1996) (" '[A]ny person who has travelled on a common carrier knows that luggage placed in an overhead compartment is always at the mercy of all people who want to rearrange or move previously placed luggage' "); Eagan, Familiar Anger Takes Flight with Airline Tussles, Boston Herald, Aug. 15, 1999, p. 8 ("It's dog-eat-dog trying to cram half your home into overhead compartments"); Massingill, Airlines Ride on the Wings of High-Flying Economy and Travelers Pay Price in Long Lines, Cramped Airplanes, Kansas City Star, May 9, 1999, p. F4 ("[H]undreds of passengers fill overhead compartments with bulky carry-on bags that they have to cram, recram, and then remove"); Flinn, Confessions of a Once-Only Carry-On Guy, San Francisco Examiner, Sept. 6, 1998, p. T2 (flight attendant "rearranged the contents of three different overhead compartments to free up some room" and then "shoved and pounded until [the] bag squeezed in"). The trial court, which heard the evidence, saw nothing unusual, unforeseeable, or special about this agent's squeeze. It found that Agent Cantu simply "felt the outside of Bond's softside green cloth bag," and it viewed the agent's activity as "minimally intrusive touching." App. 23 (Order Denying Motion to Suppress). The Court of Appeals also noted that, because "passengers often handle and manipulate other passengers' luggage," the substantially similar tactile inspection here was entirely "foreseeable." 167 F. 3d 225, 227 (CA5 1999).

The record and these factual findings are sufficient to resolve this case. The law is clear that the Fourth Amendment protects against government intrusion that upsets an " 'actual (subjective) expectation of privacy' " that is objectively " 'reasonable.' " *Smith* v. *Maryland*, 442 U. S. 735, 740 (1979) (quoting *Katz* v. *United States*, 389 U. S. 347, 361

(1967) (Harlan, J., concurring)). Privacy itself implies the exclusion of uninvited strangers, not just strangers who work for the Government. Hence, an individual cannot reasonably expect privacy in respect to objects or activities that he "knowingly exposes to the public." *Id.*, at 351.

Indeed, the Court has said that it is not *objectively* reasonable to expect privacy if "[a]ny member of the public . . . could have" used his senses to detect "everything that th[e] officers observed." *California* v. *Ciraolo*, 476 U. S. 207, 213–214 (1986). Thus, it has held that the fact that strangers may look down at fenced-in property from an aircraft or sift through garbage bags on a public street can justify a similar police intrusion. See *ibid.; Florida* v. *Riley*, 488 U. S. 445, 451 (1989) (plurality opinion); *California* v. *Greenwood*, 486 U. S. 35, 40–41 (1988); cf. *Texas* v. *Brown*, 460 U. S. 730, 740 (1983) (police not precluded from " 'ben[ding] down' " to see since "[t]he general public could peer into the interior of [the car] from any number of angles"). The comparative likelihood that strangers will give bags in an overhead compartment a hard squeeze would seem far greater. See *Riley, supra*, at 453 (O'CONNOR, J., concurring in judgment) (reasonableness of privacy expectation depends on whether intrusion is a "sufficiently routine part of modern life"). Consider, too, the accepted police practice of using dogs to sniff for drugs hidden inside luggage. See, *e. g., United States* v. *Place*, 462 U. S. 696, 699 (1983). Surely it is less likely that nongovernmental strangers will sniff at another's bags (or, more to the point, permit their dogs to do so) than it is that such actors will touch or squeeze another person's belongings in the process of making room for their own.

Of course, the agent's *purpose* here—searching for drugs—differs dramatically from the intention of a driver or fellow passenger who squeezes a bag in the process of making more room for another parcel. But in determining whether an expectation of privacy is reasonable, it is the *effect*, not the purpose, that matters. See *ante*, at 338, n. 2

("[T]he issue is not [the agent's] state of mind, but the objective effect of his actions"); see also *Whren* v. *United States*, 517 U. S. 806, 813 (1996); *United States* v. *Dunn*, 480 U. S. 294, 304–305 (1987). Few individuals with something to hide wish to expose that something to the police, however careless or indifferent they may be in respect to discovery by other members of the public. Hence, a Fourth Amendment rule that turns on purpose could prevent police alone from intruding where other strangers freely tread. And the added privacy protection achieved by such an approach would not justify the harm worked to law enforcement—at least that is what this Court's previous cases suggest. See *Greenwood, supra,* at 41 ("[T]he police cannot reasonably be expected to avert their eyes from evidence of criminal activity that could have been observed by any member of the public"); *Ciraolo, supra,* at 212–213 (rejecting respondent's argument that the police should be restricted solely because their actions are "motivated by a law enforcement purpose, and not the result of a casual, accidental observation").

Nor can I accept the majority's effort to distinguish "tactile" from "visual" interventions, see *ante,* at 337, even assuming that distinction matters here. Whether tactile manipulation (say, of the exterior of luggage) is more intrusive or less intrusive than visual observation (say, through a lighted window) necessarily depends on the particular circumstances.

If we are to depart from established legal principles, we should not begin here. At best, this decision will lead to a constitutional jurisprudence of "squeezes," thereby complicating further already complex Fourth Amendment law, increasing the difficulty of deciding ordinary criminal matters, and hindering the administrative guidance (with its potential for control of unreasonable police practices) that a less complicated jurisprudence might provide. Cf. *Whren, supra,* at 815 (warning against the creation of trivial Fourth Amendment distinctions). At worst, this case will deter law en-

forcement officers searching for drugs near borders from using even the most nonintrusive touch to help investigate publicly exposed bags. At the same time, the ubiquity of *non*-governmental pushes, prods, and squeezes (delivered by driver, attendant, passenger, or some other stranger) means that this decision cannot do much to protect true privacy. Rather, the traveler who wants to place a bag in a shared overhead bin and yet safeguard its contents from public touch should plan to pack those contents in a suitcase with hard sides, irrespective of the Court's decision today.

For these reasons, I dissent.