NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0835n.06
Filed: December 11, 2007

No. 06-1850

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| RAYMOND M. BLAKE, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| COUNTY OF LIVINGSTON et al., | ) | EASTERN DISTRICT OF MICHIGAN |
| | ) | |
| Defendants-Appellees. | ) | |

Before: MARTIN, GIBBONS, and SUTTON, Circuit Judges.

SUTTON, Circuit Judge. Raymond Blake challenges the district court's rejection of his

§ 1983 claims against several employees of Livingston County and Unadilla Township as well as

against the Township itself. We affirm in part, reverse in part and remand the case to the district

court.

I.

In October 2001, Raymond Blake responded to Nancy Bailey's personal advertisement on

Matchmaker, an online dating service. After exchanging several online messages, Blake and Bailey

met for dinner in Ann Arbor, Michigan, on Friday, October 12. During the date, Bailey talked about

her work as an artist, gave Blake her art flier, which listed her home-business address, and told him

that he could "stop by any time" as long as he "call[ed] first." JA 730. As the date was winding

down and the two were sharing past "bad experience[s]," JA 753, Blake told Bailey that another Matchmaker member, "Shamalama," "had been defaming [his] name [by] alleging that [he] was a stalker," JA 754. After returning home from dinner, Blake sent Bailey an email, thanking her "for a great evening" and stating that they "[w]ill need to do it again sometime." JA 1226. Bailey responded by thanking Blake for dinner and saying that "[i]t was fun gettin to know ya a little." *Id.*

The following day, while Blake was on Matchmaker, he suspected that Salima Rahaman—a.k.a. Shamalama—had talked to Bailey about him. At 7:13 that evening, he left a message on Bailey's answering machine, questioning whether Bailey was "screening" her calls and saying that he was "just . . . calling." JA 1544. Nine minutes later, he left another message, saying that he "was thinking about [going to] a late movie." *Id.* Recognizing that Bailey was "too perceptive for [his] trivial efforts," Blake sent Bailey an email at 11:16, in which he "confess[ed]" that he was "not a good liar" and that he was "still married and [had] an 8 month old daughter." JA 787. Recent troubles with his wife, he explained, caused him to "look[] into the personals," through which he met Rahaman, who "mistook" his interest as "stalking." *Id.* After explaining why he "react[s] so horribly to these situations," Blake concluded the email by informing Bailey that he had "deleted [his Matchmaker] profile and [would not] call [her] again." *Id.* Bailey responded on Sunday morning: "Obviously I don't think it's appropriate for us to have further contact, but I wanted to thank you for your candor. You were correct in that I sensed something was not right. . . . Best of luck to you and your family!" JA 790. Blake responded with a lengthy email on Sunday afternoon, in which he expressed doubt about his ability to "handle rejection" and asked Bailey to "leave a friendship option open." JA 793. Bailey did not respond.

The following morning, Blake left five messages on Bailey's answering machine. At 9:57, he said: "I'm going to try this again. . . . I don't know it's on my mind, but . . . I suppose when I start my mind goes blank . . . . [I]t's not like me to, well, it's pretty sad, too." JA 1544. At 9:59, he said: "I suppose I'm beginning to look like the biggest idiot on the planet now . . . . [I]f you do ever want to go out . . . maybe you can look at me . . . in between divorces or something, that's pretty tacky. . . . I didn't intend to um, if I did do anything, well[,] that's pretty sad . . . ." *Id.* At 11:45, he said: "Hey Nance, this is Ray, are you around? [T]alk to me, please." *Id.* At 11:53, he said: "Hey, it's Ray again. I think you're experiencing just a touch of my passionate side . . . maybe too much." *Id.* And at 11:54, "[s]ounding very perturbed," he said: "I think you need to increase that message to about ten minutes so I can talk[. I]f you're not going to pick up that's fine. . . . I don't know where Gregory [a town near where Bailey lived] is, [but] I'm gonna head up there to the restaurant tonight at 7. . . . I wanna see ya'. If you're not there, you know, that's fine. I know you're a nice person, you don't like to tell someone off or tell them goodbye . . . . [T]his is going to sound terrible, but there's nothing going on between my wife [and me] and that sounds . . . absolutely ridiculous, but . . . please, I'll be there at 7. . . . [M]eet me [and] give me a chance, that's all I ask. . . . [A]nd if you're not there, this is the last time I'll call." *Id.*

After hearing these messages, Bailey called Matthew Shelden, a friend of hers. According to Shelden, Bailey was "frantic and obviously in a bad condition. . . . [S]he was shaking on the phone by her trembling voice . . . and wanted [Shelden] to get . . . over there to stay with her because she had received at least 8 phone messages . . . from Ray [and] Ray was on his way." JA 1547. Shelden told Bailey that he would be over by 6:00. At 5:18, Bailey called the police, informing them

- 3 -

that she had received phone threats and emails from Blake, that Blake was coming to Gregory later that night and that she was afraid that Blake would get her address. At 5:47, Blake left another message for Bailey: "Nance, this is Ray. . . . I don't know how I'm gonna find this place. . . . [A]nd even if I wanted to find Gregory there's no way I could find Willard [Bailey's home town]. . . . [B]ut anyways, I'm going to try. . . . If I'm there in an hour, I'm gonna try. [S]o if you're not there at 7 uh maybe I'll get imaginative. Talk to you then." JA 1545.

Officer Richard Knieper of the Unadilla Township Police Department arrived at Bailey's rural house around 7:15. JA 816. By that time, Shelden was there, and Bailey "appeared to be normal . . . for somebody making a complaint," though "she was concerned for her safety." JA 817. Over the next 45 minutes, Bailey showed Blake's emails to Knieper, played Blake's phone messages for him, told him that she had informed Blake that "she was not interested in seeing a married man," JA 824, and told him that she was afraid that Blake may show up at her residence.

Just as Knieper was leaving Bailey's residence to search for Blake, Blake pulled into the driveway. Bailey "in fear went for her room," JA 1547, while Knieper approached Blake's car, asked him to step out of the car and, with Blake's consent, searched him, finding nothing. After handcuffing Blake and placing him in the back of his squad car, Knieper asked Blake if he could search his car. Blake consented to the search, though on the apparent understanding that Knieper would search only for drugs and weapons. Knieper's search yielded "a bunch of [Matchmaker] profiles and e-mail type stuff" that were "hanging out of [a] black bag" on Blake's front seat. JA 829. The profiles and emails contained a "substantial amount of information on people," including Bailey. *Id.*

- 4 -

Following the search, Knieper contacted William Vailliencourt, an assistant prosecutor for Livingston County, to see if "Vailliencourt felt that [Knieper] had enough probable cause to obtain [an arrest] warrant." JA 832. After the phone call, Knieper arrested Blake for stalking, transported him to the police station and impounded his car.

At 11:45 that evening, Knieper advised Blake of his Miranda rights, which Blake waived, and along with Lieutenant Michael Shegan began questioning him. At some point during the interview, in response to "threat[s]" by the officers that he could go to prison for five years for stalking, Blake told the officers that he had emails on his home computer that would support his claim that he was not stalking Bailey. JA 726. He also told the officers that he had a business computer but that nothing related to Bailey was on that computer. Blake then gave the officers written "permission to remove" his home and business "computers for forensic inspection pertaining to the investigation of Nancy Bailey." JA 801. In return, says Blake, the officers agreed that they would "bring the computer[s] back" to the station and, if Blake was telling the truth about the "exculpatory" information on his computers, they would "let [him] go." JA 725.

At 2:27 the following morning, Knieper and Shegan, accompanied by Blake, seized the computers and some CD-ROMs from Blake's business. No one ever searched the computers, however, and Blake was held at the county prison until his arraignment later that day on charges of stalking and using a computer to commit a crime. On January 11, 2002, the county dropped the stalking and computer charges against Blake in return for his plea of no contest to charges of criminal trespassing and disorderly behavior. The county returned Blake's computers to him on January 16, 2002, but never returned the CD-ROMs.

On October 10, 2003, Blake brought this § 1983 action in federal court against Livingston County, Unadilla Township, Knieper, Shegan, Vailliencourt and several others, including Unadilla Township chief of police, James Lyttle. Blake alleged violations of more than half of the Bill of Rights (the First, Second, Fourth, Fifth, Sixth and Eighth Amendments) as well as the Fourteenth Amendment and several provisions of Michigan law. The district court dismissed Blake's state-law claims without prejudice—refusing to exercise supplemental jurisdiction over those claims "so as to avoid jury confusion"—and dismissed his Second, Fifth, Sixth and Eighth Amendment claims for failure to state a claim upon which relief could be granted and ordered him to file an amended complaint. JA 64. After Blake filed his amended complaint, the court rejected the remaining claims as a matter of law through a series of pre-trial rulings.

II.

A.

Blake first contends that the district court erred in concluding that Knieper had probable cause as a matter of law to arrest him for stalking. The existence of probable cause depends on "whether, at the moment the arrest was made, . . . the facts and circumstances within [the officer's] knowledge and of which [the officer] had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964). Michigan law defines stalking as "a willful course of conduct involving repeated or continuing harassment of another individual that would cause a reasonable person [and that actually causes the victim] to feel terrorized, frightened, intimidated,

threatened, harassed, or molested." Mich. Comp. Laws § 750.411h. It further defines (a) "course of conduct" as "a pattern of conduct composed of a series of 2 or more separate noncontinuous acts evidencing a continuity of purpose," (b) "harassment" as "conduct directed toward a victim that includes . . . repeated or continuing unconsented contact that would cause a reasonable individual [and that actually causes the victim] to suffer emotional distress" and (c) "unconsented contact" as "contact with another individual that is initiated or continued . . . in disregard of that individual's expressed desire that the contact be avoided or discontinued," including "[e]ntering onto . . . property owned . . . or occupied by that individual," "[c]ontacting that individual by telephone" or "[s]ending . . . electronic communications to that individual." *Id.*

When he detained Blake, Knieper had the following information: (1) Bailey's email telling Blake that she "[o]bviously" did not think it was appropriate for them "to have further contact," JA 790; (2) Blake's subsequent email to Bailey expressing doubt about his ability to "handle rejection," JA 793; (3) Blake's email telling Bailey that Rahaman had accused him of stalking; (4) Blake's five subsequent phone messages on Monday morning, including the last one in which he sounded "very perturbed" and said he was coming to Gregory to see Bailey, JA 1544; (5) Bailey's call to the police complaining of threatening phone messages and emails from Blake; (6) Blake's subsequent phone message on Monday evening telling Bailey that if she was not at the restaurant at 7:00, he was going to "get imaginative," JA 1545; (7) Bailey's comments to Knieper that she told Blake that she was not interested in seeing a married man and that she was afraid that Blake would show up at her residence; (8) Shelden's presence at Bailey's residence to comfort and, if necessary, protect Bailey; and, perhaps most importantly, (9) Blake's arrival at Bailey's residence on Monday night.

Armed with this information, Knieper had probable cause to arrest Blake. Even before Blake showed up at Bailey's home, Knieper had ample reason to believe that Blake had frightened Bailey through his repeated calls and emails—and indeed that any reasonable individual would have felt the same way Bailey did, particularly if the individual lived in a rural area like Bailey did. An officer in Knieper's position also reasonably could have concluded that Blake's actions constituted a "course of conduct" under § 750.411h, *see, e.g.*, *People v. White*, 536 N.W.2d 876, 881 (Mich. Ct. App. 1995) ("Logically, defendant's repeated calls and threats made on June 9 were sufficient to establish a course of conduct to support the felony stalking charge . . . ."), and that Blake's contact with Bailey "disregard[ed] . . . [her] expressed desire that the contact be avoided or discontinued," Mich. Comp. Laws § 750.411h. The district court did not err in concluding that Knieper had "ample probable cause to arrest [Blake] for stalking" and that Blake "produced no evidence to support a reasonable jury verdict to the contrary." D. Ct. Op. at 12.

Noting that the stalking statute contains the term "willful," Blake submits that he did not act "with the requisite intent . . . to cause [Bailey] to experience significant mental suffering." Br. at 32 (emphasis omitted). But in this context "'willful' refers to the harassing course of conduct and not the ultimate result. To hold otherwise would allow [a] defendant to continue harassing and contacting the victim without abatement simply because he genuinely feels that maintaining contact will eventually restore his [relationship]. Such a result does not have support in the statute or in common sense." *People v. Herzberg*, No. 265546, 2007 WL 839375, at *1 (Mich. Ct. App. Mar. 20, 2007) (per curiam); *see also People v. Hall*, No. 180384, 1996 WL 33362552, at *1 (Mich. Ct. App. June 18, 1996) (per curiam) (holding that "the term 'willful' modifies the 'course of conduct'

element" and explaining that "the Legislature did not intend that this be a specific intent crime"). Because Blake plainly meant to call (and email) Bailey and to show up at her house, his conduct satisfied the willfulness requirement.

It does not change matters, contrary to Blake's contention, that the State ultimately dropped the stalking charges against Blake in exchange for his no-contest plea. *See Masten v. Jackson County*, No. 97-1987, 1998 WL 880303, at *3 (6th Cir. Nov. 27, 1998) ("It is . . . of no moment that the prosecutor later made a judgment that there was not sufficient evidence of stalking as would likely result in a conviction."). Nor does it make a difference that Knieper did not intend to arrest Blake when he left Bailey's house (prior to Blake's arrival). *See Bond v. United States*, 529 U.S. 334, 338 n.2 (2000) ("[T]he subjective intent of the law enforcement officer is irrelevant in determining whether that officer's actions violate the Fourth Amendment.").

B.

Blake next challenges the district court's summary-judgment conclusion that he consented to the search of his car. We reject this contention.

In Blake's own words, he "gave [Knieper] permission" to search his car for drugs and weapons and told Knieper to "[g]o ahead" and search because he "had nothing to hide." JA 745, 1089; *see also* JA 828 (Knieper stating that Blake "gave [him] consent to search his vehicle"). As the district court correctly explained, moreover, "Knieper's alleged statement that he would get a warrant to search [Blake's] car did not render [Blake's] consent invalid." D. Ct. Op. at 13; *see also United States v. Salvo*, 133 F.3d 943, 954 (6th Cir. 1998) (explaining that notifying a person that a

- 9 -

warrant can be obtained does not render consent involuntary unless the threat to obtain the warrant is baseless).

Blake does no better in arguing that he limited the scope of his consent to a search for drugs or weapons. Even assuming for the sake of argument that he has created a factual dispute over the scope of his consent, that does not help him. The seizure of the Matchmaker profiles and other documents was still lawful because, as the uncontested evidence showed, the documents were in plain view and their incriminating nature was readily apparent. *See* JA 829 (Kneiper testifying that the Matchmaker profiles were "hanging out" of Blake's bag such that he "could see information there"); *United States v. Calloway*, 116 F.3d 1129, 1133 (6th Cir. 1997); *see also* D. Ct. Op. at 6 & n.4 (indicating that the documents were "[p]rotruding from [Blake's] bag" and explaining that Blake "point[ed] to no evidence to support [the] assertion" in his brief that the documents were not in plain view).

C.

Blake next argues that the district court erred in failing to address his claim that the seizure of his business computer and CD-ROMs was unlawful. We agree. Although the district court correctly rejected Blake's claims that his home and business computers were unlawfully searched (because the officers never searched the computers), it erred in "treat[ing]" Blake's business-computer-related claim "only as [an] unlawful search claim[]," as opposed to an unlawful search and seizure claim. D. Ct. Op. at 12 n.8. In count four of his second amended complaint (entitled "Unlawful Search and Seizure of Business Address"), Blake alleged that his "company's file

- 10 -

server/computer was unlawfully *seized* without a warrant . . . causing great hardship to [him]" and that "Knieper and Shegan unlawfully *seized* without a warrant, two CDROM's [from his business] . . . causing great hardship to [him]." JA 631 (emphases added). Blake made no such claim related to his home computer.

Rather than determine for ourselves whether Blake's consent to the seizure of his business computer was voluntary and encompassed the CD-ROMs, we remand this claim to the district court for it to consider in the first instance. In doing so, we point out that the district court, in addressing Blake's claim that he was injured by this allegedly unlawful seizure, may wish to consider whether one of Blake's bond conditions—that he could not possess or use a computer—bears on the cognizability of this claim. Blake may pursue this claim, it bears adding, against only Knieper and Shegan, as Blake has presented no evidence that any of the other defendants seized the computer and CD-ROMs.

D.

Blake's three remaining arguments are meritless. *First*, the district court correctly denied Blake's motion to file a third amended complaint to reinstate Unadilla Township as a defendant and to allege that the Township's "policy" of having its police officers consult with Livingston County prosecutors prior to making a warrantless arrest is unconstitutional because it "avoid[s] the need to have questionable cases regarding probable cause submitted to a neutral magistrate for determination." Br. at 13. The amendment would have been futile. Warrantless arrests are not per se unconstitutional, and, even under Blake's reading, the Township's alleged policy satisfies the

constitutional requirement of a prompt judicial determination of probable cause following a warrantless arrest. *See County of Riverside v. McLaughlin*, 500 U.S. 44, 47, 56 (1991). Prosecutors, moreover, not only are permitted to give such advice to police officers, but they also are afforded qualified immunity in a § 1983 action seeking damages for the advice given. *See Burns v. Reed*, 500 U.S. 478, 494–96 (1991).

*Second*, the district court correctly rejected Blake's claim that the defendants violated his due-process rights by allegedly withholding exculpatory evidence from him before his guilty plea. As the district court correctly indicated, Blake never "identif[ied] any [suppressed exculpatory] evidence," D. Ct. Op. at 16, and "[m]ere speculation that a government file may contain *Brady* material is not sufficient" to prove a due-process violation, *United States v. Driscoll*, 970 F.2d 1472, 1482 (6th Cir. 1992) (internal quotation marks omitted), *abrogated on other grounds by Hampton v. United States*, 191 F.3d 695 (6th Cir. 1999). "No *Brady* violation exists," moreover, where, as here, the "defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information." *United States v. Clark*, 928 F.2d 733, 738 (6th Cir. 1991) (internal quotation marks omitted). Even assuming that his computers and voice messages and Bailey's art flier contained exculpatory information, Blake undoubtedly had reason to know of the information. What is more, although Blake lodged this claim against several defendants, his complaint and his brief suggest that the claim is against only Livingston County prosecutors. *Cf. Lindsay v. Bogle*, 92 F. App'x 165, 170 (6th Cir. Feb. 3, 2004) ("[T]he *Brady* obligation applies only to prosecutors."). And a prosecutor's "non-disclosure of exculpatory information [is] certainly entitled to absolute immunity." *Jones v. Shankland*, 800 F.2d 77, 80 (6th Cir. 1986).

*Third*, the district court did not abuse its discretion in declining to exercise supplemental jurisdiction over Blake's state-law claims. The district court reasonably concluded that these numerous and wide-ranging claims would confuse the jury.

III.

For these reasons, we affirm in part, reverse in part and remand the case to the district court to address Blake's claim that Knieper and Shegan unlawfully seized his business computer and CD-ROMs.