

# NUMBER 13-13-00155-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

THE STATE OF TEXAS,                                                **Appellant,**

**v.**

UYLESS TROY BLAND,                                              **Appellee.**

## On appeal from the 377th District Court
## of Victoria County, Texas.

# OPINION

## Before Justices Benavides, Perkes, and Longoria
## Opinion by Justice Longoria

Uyless Troy Bland was charged with possession of less than one gram of a controlled substance in penalty group 1, a state jail felony. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.115(b) (West 2010). After holding an evidentiary hearing, the trial court granted Bland's motion to suppress the evidence of the controlled substance. The State now appeals by five issues. For the reasons set forth below, we affirm.

# I. Background

The factual background of this case was developed during the evidentiary hearing held on Bland's motion to suppress.[1] At the hearing, which was conducted on March 8, 2013, the State offered the testimony of two patrol officers employed by the City of Victoria Police Department.

Officer Stephen Lang testified that during the daytime hours of October 18, 2012, he received a call to assist another officer working an assault or possibly a robbery on Cameron Street. According to Officer Lang, when he arrived at the location, he encountered the "victim," James Hayes, who had injuries to his face and was bleeding, and a second patrol officer, Officer Heather Rodriguez, who was gathering information on whether it was an assault or a robbery. After speaking to Officer Rodriguez, Officer Lang travelled to the 900 block of Depot Road, where the complainant had indicated that the incident occurred. Officer Lang stopped in front of 906 Depot Road, a house with the front door wide open. He proceeded to the house and "found a blood trail in the house, from the front porch." From prior experiences, Officer Lang knew the house was a "troubled house" and had been the subject of prior "drug and assault investigations."

When he got to the front porch, he saw blood droplets leading into the house. And from the open doorway, he observed a table in the middle of a kitchen, where a bloody towel had been discarded. He saw a woman standing in a back bedroom looking at him, and he asked her to come to the door to speak to him. Her name was Lezlie Jackson. When she came to the door, Officer Lang "asked her, basically, who

---

[1] In his motion to suppress, Bland asserted three grounds for relief: (1) he was arrested without lawful warrant, probable cause, or other lawful authority; (2) any statements the police obtained from him were obtained unlawfully; and (3) any tangible evidence seized by the police was seized without lawful warrant, probable cause, or other lawful authority.

else was in the house and what happened, and she began to tell . . . [him] the owner [of the house] . . . 'Stinker' was his name . . . [also known as] Royal Mumphord . . . was assaulted." Officer Lang testified that he was familiar with Mumphord and that Mumphord was not the same man that he had initially encountered on Cameron Street. Jackson informed Officer Lang that there were two or three other people in the house, in the back bedrooms, but that Mumphord was not there, and she told Officer Lang she could not give him consent to enter the house to speak with the other occupants because it was not her house. Based on the blood evidence, Officer Lang believed that there could be additional victims inside the house, but he did not ask Jackson if anyone was hurt or injured.

Between two and five minutes after Officer Lang arrived at the house, Officer Rodriguez joined him, and together they entered the house "to look for additional victims and render aid, if necessary." He went to the left, and she went to the right. Proceeding to the back bedroom, Officer Lang found Bland sleeping on a couch, and continuing farther into the house, without waking Bland, he found a second woman, Stella Sanchez, and asked her to come to the front of house. She complied. He then went to Bland and woke him up. By Bland's foot, on the couch, Officer Lang "could see some paraphernalia - - a crack pipe." He "proceeded to wake him up, for the paraphernalia he was in immediate control of." As Officer Lang was arresting Bland, a black container fell off the couch. He opened it and found that it contained crack cocaine. Officer Lang escorted Bland to the porch, photographed the scene, and then left the house. Officer Rodriguez had been with him the entire time.

After Officer Lang gave the foregoing testimony, the State offered, and the trial court admitted into evidence, State's Exhibits 1 through 13, which were the photographs

3

taken by Officer Lang at 906 Depot Road. Then, the State elicited more testimony from Officer Lang, who stated that the house was dark and did not appear to have electricity. He also testified that he and Officer Rodriguez never actually found anyone injured in the house after they went inside.

On cross-examination, Officer Lang testified that the victim, James Hayes, had told Officer Rodriguez "that a large, heavy-set black male had committed the assault against him" and that he received that description of the suspect from Officer Rodriguez. He further testified that although "Royal Mumphord is a black male, . . . [h]e's not a particularly tall man." According to Officer Lang, "[h]e's skinny and short." He testified that when he travelled to Depot Road, he was not looking for Mumphord, even though he knew that Mumphord "stayed there" at 906 South Depot. Officer Lang also testified that Jackson changed her story. Initially, she told him that Mumphord had been assaulted, but later, she told him that it was Hayes's blood—that "[h]e had come to the house and cleaned himself up." He did not specify at what point in time Jackson had changed her story—whether it was before or after he had entered the house. Officer Lang also testified that he did not "try to ascertain from . . . Jackson whether or not the person that assaulted . . . Mumphord had left the scene or where he was." He admitted that "the blood on the pictures could be a nose bleed," that "[t]here wasn't blood all over the walls," or "all over the carpet." Yet, he maintained that he went into the house "looking for additional victims . . . [to] see if . . . [they] needed to render medical help." When he walked by Bland initially, he did not see any injuries.

During the cross-examination, Officer Lang also testified that before entering the house, he had "evidence to believe there was evidence of a crime inside the house or that a crime was being committed in the house." This was based on "the assault victim

4

and where he described it happened and finding the blood drops." He suspected that a crime had occurred, but he admitted that he did not have probable cause. Then, he retracted that statement and reversed his answer, stating that he did have probable cause based on the victim saying "he was assaulted on that block and there was blood on the porch." Counsel for Bland asked him, "Are you sure you just weren't looking for drugs when you went in there?" But Officer Lang said that was not true. "It wasn't until . . . [he] tried to wake up . . . [Bland] that . . . [he] saw the pipe in full sight." Officer Lang maintained that he entered the house "to preserve life or avoid serious injury."

The following exchange then occurred between Bland's counsel and Officer Lang:

> Q    When you entered the house, passed my client, entered the other bedroom and found not only my client was asleep but the other person was asleep, did that dispel your belief that you had an --
>
> A    I'm still clearing the house, to make sure nobody is hurt inside. I don't understand what you're asking.
>
> Q    So, after you find out that -- You walk past Mr. Bland, you don't check for injuries. You see he's not in immediate danger. You walk on and you encounter Stella Sanchez and she's not in immediate danger. Does this dispel this belief -- the reason you went in there?
>
> A    Yes, sir. I knew, at that point, there were no injured parties, at that time.
>
> Q    Did you leave the house?
>
> A    When I was waking up Mr. Bland, that's when I saw the cocaine there.
>
> Q    So, you went to wake up my client, after you knew there was no immediate danger?
>
> A    Yes, sir.

5

On re-direct examination, the following exchange took place between the prosecutor and Officer Lang:

Q      Did you have to wake up Mr. Bland?

A      Yes, I did.

Q      Did you know if he was injured, since you had to wake him up?

A      No, sir.

Q      You didn't search the house?

A      No, sir.

Q      You left the house as soon as you saw what you saw and you got Mr. Bland and took him out?

A      Yes, sir.

The State then called its second witness, Officer Rodriguez, who testified that on the date in question, she "received a call for a welfare check, for a subject that was bleeding in the 900 block of South Cameron." She "made contact with . . . Hayes in the 900 block of South Cameron and he had a laceration or wound to the right eye." She "immediately called for EMS to come assist him." She "asked him what happened and he said a large black man had approached him while walking in the 900 block of South Depot and asked where he could buy drugs and he said he wasn't going to tell him." The man allegedly "punched him and took off running." Hayes "didn't know if he had been robbed or not." Officer Rodriguez "asked Officer Lang to check the neighborhood for a suspect," relaying Hayes's report that the suspect departed in the direction of Depot Road.

Officer Rodriguez testified that she later met Officer Lang at 906 South Depot, where he was speaking with Jackson. Officer Rodriguez testified that she "could see

6

inside the doorway." "There was blood on the kitchen floor, bleeding into the hallway." She "didn't know what had happened, but somebody was injured." Jackson told the officers that "the person who was assaulted was 'Stinker,'" but she "didn't know where he was." Officer Rodriguez testified that when she and Officer Lang entered the house, it was not to search the house, but "[t]o make sure there was no one else there." She could not tell whether Bland was injured. She testified that even as a trained paramedic, she could not tell "from that distance." However, she had "been to that house previously, for an aggravated assault, where a female was beaten severely and she was inside that location."

On cross-examination, Officer Rodriguez testified that when she arrived at 906 Depot Road, Officer Lang was talking to Jackson and that Jackson "said 'Stinker' was injured and had been bleeding and [she] didn't know where he was." After speaking with Jackson, Officer Rodriguez was unsure whether she was "dealing with a single incident" reported by Hayes because Jackson had "stated it was . . . Mumphord that had been assaulted and was bleeding." She saw "some [blood] in the grass, some on the sidewalk, and some in the kitchen." Counsel for Bland asked if Officer Rodriguez believed that the blood she observed at the house "could have been from a child's nose bleed," and she said "no." She "didn't know what had happened, but somebody was injured." She called out "in a loud voice," "Police. If there's anybody in there, come out." She "didn't get a response." She then entered the house with Officer Lang.

After the testimony was concluded, the trial court asked Bland's counsel to state his legal objection, and counsel answered as follows:

> Your Honor, I object to the entry of the house by Officer Lang and Officer Rodriguez. There was no consent to enter the home. There was no evidence of probable cause that contraband or other evidence would be

7

found in the home and exigent circumstances justified entry into that home.

The officer was not doing a protective sweep incident to arrest, nor was he trying to secure the scene for officer care after the stop. That leaves only the emergency doctrine.

. . . .

I don't believe that the evidence showed that there was an imminent threat of serious bodily harm or life, and the officer must have acted pursuant to that threat. Any threat would have been dispelled prior to waking Mr. Bland. Waking Mr. Bland from his sleep violated his right to privacy and would go beyond the emergency doctrine.

And, further, there was no probable cause for the arrest for possession of the crack pipe, possession of drug paraphernalia, because my client was - - the item was not found on his person and there was no affirmative link between the client.

After Bland's objections were concluded, the trial court asked for a response from the State, and the State answered as follows: "This was exigent circumstances. There was blood and they did not know if anybody was hurt. They did not search the house. Everything they saw, once they were in the house, was in plain view."

Before the hearing was concluded, Bland's counsel handed two cases to the judge, who stated that he would review them. The cases were *Gonzalez v. State*, 148 S.W.3d 702, 704 (Tex. App.—Austin 2004, pet. ref'd), which discusses the emergency aid doctrine, and *Reasor v. State*, 12 S.W.3d 813, 815 (Tex. Crim. App. 2000), which discusses protective sweeps.

On March 15, 2013, the trial court entered an order granting Bland's motion to suppress. In relevant part, the trial court's order stated as follows:

The Court, having considered the testimony, exhibits, and argument presented on March 8, 2013, finds as follows:

the officer that approached 906 S. Depot was aware of an assault that had just occurred in the area;

8

the officer observed the door to the residence to be open, saw blood droplets leading from the porch inside the residence, and saw a blood[-]soaked towel on the table in the residence from his location outside the residence;

although the officer did not have consent to enter the residence, the officer had an immediate reasonable belief that he must enter the residence to search for anyone needing immediate medical attention due to the bleeding;

the officer entered the residence, observed the defendant sleeping on the couch, did not observe the defendant bleeding or needing immediate medical attention, and therefore continued to another room, observing a female who was not bleeding nor needing immediate medical attention, waking her up and asking [her] to come to the front room;

when the officer returned to the front room, the officer went over to the part of the room where the defendant was sleeping to wake him up, and did not discover the evidence seized until he went to that portion of the room to awaken the defendant.

The Court finds that although the officer's entry into the house without consent was justified under the emergency doctrine, the officer had determined no[]one required immediate medical attention prior to returning to the front room, and the evidence seized was found after the course of his legitimate emergency activities had ended.

Therefore, the Motion to Suppress is granted and all evidence recovered is suppressed.

This appeal ensued.

## II. ANALYSIS

By five issues, which we will address as one issue, the State contends that the trial court erred in granting Bland's motion to suppress.[2]

---

[2] The State presents its issues as follows:

(1) Is the legal standard for review in this case de novo?

(2) Did Officers Lang and Rodriguez have an immediate, reasonable belief that a person inside Appellee's residence was in need of immediate medical aid?

9

## A. Standard of Review

We review a trial court's ruling on a motion to suppress for abuse of discretion, using a bifurcated standard. *See Guzman v. State*, 955 S.W.2d 85, 88–89 (Tex. Crim. App. 1997); *Villarreal v. State*, 935 S.W.2d 134, 138 (Tex. Crim. App. 1996). Generally, with respect to a suppression ruling, the trial court's findings of historical fact supported by the record, as well as mixed questions of law and fact that turn on an evaluation of credibility and demeanor, are given "almost total deference." *Guzman*, 955 S.W.2d at 89. A de novo standard is applied to a trial court's determination of the law and its application of law to the facts that do not turn upon an evaluation of credibility and demeanor. *Id.* We will uphold a trial court's ruling on a motion to suppress if the ruling is reasonably supported by the record and is correct under any theory of law applicable to the case. *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006).

## B. Applicable Law

"To suppress evidence on an alleged Fourth Amendment violation, the defendant bears the initial burden of producing evidence that rebuts the presumption of proper police conduct." *Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005). "A defendant satisfies this burden by establishing that a search or seizure occurred without a warrant." *Id.* "Once the defendant has made this showing, the burden of proof shifts to the State where it is required to establish that the search or seizure was conducted pursuant to a warrant or was reasonable." *Id.*

---

(3) Were Officers Lang and Rodriguez acting solely to render emergency aid when they entered the residence or were they also acting as crime-fighters?

(4) Was Officer Lang still acting within the scope of the Emergency Aid Doctrine when he approached Appellee a second time? and

(5) Was the seizure of contraband evidence from Appellee lawful?

"The Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid."  *See Laney v. State*, 117 S.W.3d 854, 860 (Tex. Crim. App. 2003) (quoting *Mincey v. Arizona*, 437 U.S. 385, 392 (1978)).  We use an objective standard of reasonableness in determining whether a warrantless search is justified under the emergency aid doctrine.  *Id*. at 862.  "This objective standard looks at the police officer's conduct and takes into account the facts and circumstances known to the police at the time of the search."  *Id*. (quotations omitted).  "Furthermore, we look to ensure that the warrantless search is strictly circumscribed by the exigencies which justify its initiation." *Id*. (quotations omitted).  However, "[t]he fact that the protection of the public might, in the abstract, have been accomplished by less intrusive means does not, by itself, render the search unreasonable."  *Id*. (quotations omitted).  "If the emergency doctrine applies, the police may seize any evidence that is in plain view during the course of their legitimate emergency activities."  *Id*.

## C. Discussion

As set forth above, the trial court ruled that although the emergency aid doctrine initially justified the warrantless entry and search of the premises, the entry and search became unreasonable after Officer Lang determined that no one inside the house required immediate medical attention.  On appeal, the State maintains that the trial court committed reversible error because Officer Lang had a reasonable belief that there was an unknown person needing immediate medical attention when he approached Bland for the second time and observed the crack pipe in plain view.  We disagree.[3]

---

[3]  For purposes of this appeal, we will assume without deciding that the emergency aid doctrine justified the officers' initial entry and search of the premises.  *See* TEX. R. APP. P. 47.1.

11

When the trial court makes explicit fact findings, as it did in this case, we must determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports those findings. *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). In this case, the trial court found that before approaching Bland for the second time, Officer Lang had determined that no one, including Bland, needed immediate medical attention. Viewing the evidence in the light most favorable to the trial court's ruling, we conclude that the evidence supports the trial court's finding. *See id.*

On cross-examination, Officer Lang testified that after he found the second woman in the back bedroom, he knew "there were no injured parties, at that time." He also admitted that he "went to wake up" Bland after he "knew there was no immediate danger," which is when he discovered the crack pipe. Subsequently, on re-direct examination, Officer Lang testified that when he went to wake up Bland, he did not know whether Bland was injured. The trial court resolved this conflicting testimony against the State by finding that before approaching Bland for the second time, Officer Lang had determined that no one, including Bland, needed immediate medical attention.

We must defer to this finding of historical fact by the trial court because it is supported by the record.[4] *State v. Mendoza*, 365 S.W.3d 666, 669 (Tex. Crim. App.

---

[4] We note that in the context of an analysis under the Fourth Amendment, we must preserve the distinction between a police officer's subjective intent and the officer's knowledge. *See Wiede v. State*, 214 S.W.3d 17, 25 (Tex. Crim. App. 2007). The subjective intent of the officer is treated as "irrelevant." *See Bond v. United States*, 529 U.S. 334, 339 n.2 (2000) ("[T]he subjective intent of the law enforcement officer is irrelevant in determining whether that officer's actions violate the Fourth Amendment."); *Walter v. State*, 28 S.W.3d 538, 542 (Tex. Crim. App. 2000) (same). In contrast, the officer's knowledge (i.e., what facts and circumstances were known to the officer at the time in question) is a historical fact that is relevant in a Fourth Amendment analysis. *See Laney v. State*, 117 S.W.3d 854, 862 (Tex. Crim. App. 2003) (explaining that under the objective standard of reasonableness we "look[] at the police officer's conduct and take[] into account the facts and circumstances known to the police at the time of the search"). Therefore, in this case, Officer Lang's subjective intent or actual reason for approaching Bland the second time is irrelevant, whereas his knowledge about whether Bland was injured is relevant. *See*

2012) ("In reviewing the ruling on a motion to suppress, appellate courts must give almost total deference to a trial judge's findings of historical fact and credibility determinations."); *Penry v. State*, 903 S.W.2d 715, 744 (Tex. Crim. App. 1995) ("[I]f the record supports the trial court's findings, we will not disturb those findings."). Faced with Officer Lang's conflicting version of events, the trial court, as the sole finder of fact, had discretion to accept or reject Officer Lang's testimony that he did not know whether Bland was injured when he approached him the second time. *See Wiede v. State*, 214 S.W.3d 17, 24–25 (Tex. Crim. App. 2007) ("[A] trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony when entertaining a motion to suppress.") (quotations omitted); *Alvarado v. State*, 853 S.W.2d 17, 23 (Tex. Crim. App. 1993) ("The judge may believe or disbelieve all or any part of a witness's testimony."). Under these circumstances, we must defer to the trial court's decision to accept Officer Lang's testimony that he "knew there was no immediate danger" and "there were no injured parties, at that time." *See Manzi v. State*, 88 S.W.3d 240, 243 (Tex. Crim. App. 2002) (agreeing with the United States Supreme Court that "appellate courts should review a trial court's determination of historical facts under a deferential standard, even if that determination was *not* based upon an evaluation of credibility and demeanor") (emphasis in original) (citing *Anderson v. Bessemer City*, 470 U.S. 564, 573–74 (1985)).

Next, we review the trial court's legal ruling under a de novo standard of review. *See Kelly*, 204 S.W.3d at 818; *see also Gonzales v. State*, 369 S.W.3d 851, 854 (Tex. Crim. App. 2012) ("All purely legal questions are reviewed de novo."). The trial court ruled that Officer Lang's legitimate emergency activities ended when he determined that

*Bond*, 529 U.S. at 339 n.2; *Laney*, 117 S.W.3d at 862; *Walter*, 28 S.W.3d at 542.

no one required immediate medical attention. We agree. "[T]he lawfulness of an emergency search terminates once the emergency ends." *Brimage v. State*, 918 S.W.2d 466, 503 (Tex. Crim. App. 1996) (citing *Bray v. State*, 597 S.W.2d 763, 764 (Tex. Crim. App. 1980)). Therefore, the lawfulness of Officer Lang's warrantless entry and search of the premises terminated once he determined that no one required immediate medical attention. *See Laney*, 117 S.W.3d at 861 (stating that "[u]nder the emergency doctrine, the officer [must have] . . . an immediate, reasonable belief that he must act to protect or preserve life or avoid serious injury") (quotations omitted).

The State contends that Officer Lang's presence inside the home was justified because he had a reasonable belief that there was an ongoing emergency and that Bland could "provide them with the details about who and where the wounded man was that were needed to help them resolve the emergency." However, the scope of the emergency aid doctrine is limited to an emergency involving a person "within" the premises. *See Mincey*, 437 U.S. at 392 (recognizing "that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person *within* is in need of immediate aid") (emphasis added). Thus, for purposes of the emergency aid doctrine, the emergency that justified the warrantless entry and search of the premises in this case ended when Officer Lang determined that no one inside the house needed immediate medical attention, which was before he approached Bland for the second time. *See id.*; *Laney*, 117 S.W.3d at 862 (stating that the warrantless entry and search must be "strictly circumscribed by the exigencies which justify . . . [their] initiation"). Furthermore, the Texas Court of Criminal Appeals has held that an officer's warrantless presence within a home is not justified under the emergency aid doctrine when it is clear that he perceived no emergency that

14

would require remaining in the home in order "to protect or preserve life or avoid serious injury." *Miller v. State*, 393 S.W.3d 255, 265 (Tex. Crim. App. 2012). Therefore, we reject the State's contention that Officer Lang was still acting within the scope of the emergency aid doctrine when he approached Bland for the second time and observed the crack pipe in plain view, which is the sole basis asserted by the State to support the lawfulness of Officer Lang's warrantless search of the house that led to the discovery and seizure of the suppressed evidence. Accordingly, without further discussion, we overrule the State's issues. *See* TEX. R. APP. P. 47.1.

### III. CONCLUSION

We affirm the order of the trial court.

_____
NORA L. LONGORIA
Justice

Publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
3rd day of October, 2013.