WOOD, Circuit Judge,
dissenting.
This case presents a critically important question about the government’s ability constantly to monitor a person’s movements, on and off the public streets, for an open-ended period of time. The technological devices available for such monitoring have rapidly attained a degree of accuracy that would have been unimaginable to an earlier generation. They make the system that George Orwell depicted in his famous novel, 1984, seem clumsy and easily avoidable by comparison. This court recognized in United States v. Garcia, 474 F.3d 994 (7th Cir.2007), that “the meaning of a Fourth Amendment search must change to keep pace with the march of science.” Id. at 997. We sensibly commented further in that case that we were not closing the door to future developments: “Whether and what kind of restrictions should, in the name of the Constitution, be placed on such surveillance when used in routine criminal enforcement are momentous issues that fortunately we need not try to resolve in this case.” Id. at 998.
Today we must decide whether to extend the rule announced in Garcia, which held that the attachment of a Global Positioning System, or GPS, tracking device on a car did not require a warrant — when the device was attached in public, it merely stored data, and it was retrieved in public — should be extended to a more sophisticated GPS tracker that transmitted at four-minute intervals information about the vehicle’s location to a central monitoring office for 60 hours. My colleagues have decided that Garcia should be so extended. In doing so, they part company with the District of Columbia Circuit’s thought-provoking opinion in United States v. Maynard, 615 F.3d 544 (D.C.Cir.2010), reh’g denied sub nom. United States v. Jones, 625 F.3d 766 (D.C.Cir.2010). With respect, I cannot take these steps. Although I part ways in some respects from the reasoning adopted by the D.C. Circuit, I would follow the ultimate conclusion announced in Maynard and find that the police cannot conduct a search using a device like the one here without first obtaining a warrant. I would therefore reverse the judgment of the district court.
. I
I have no quarrel with a number of basic propositions on which the majority and the concurring opinions rest. First, before the Fourth Amendment enters the picture at all, there must be something amounting to a search (or seizure). Kyllo v. United States, 533 U.S. 27, 31, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001). Second, we must answer two questions in order to decide whether a protected search has taken place: (1) does the person have a subjective expectation of privacy under the circumstances; and (2) is that expectation objectively reasonable, or put differently, is it one that society should recognize. Katz v. United States, 389 U.S. 347, 360, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring). We all agree that the only issue here is whether Cuevas-Perez’s expectation of privacy met the second criterion. Third, a search is generally unlawful if not authorized by a warrant, unless one of the few delineated exceptions to the warrant requirement applies. See Katz, 389 U.S. at 357, 88 S.Ct. 507.
The majority appears to take the position that there is no “search” in any case *287 where the government attaches even the most sophisticated GPS device to a vehicle in public and then activates that device so that the police may track every movement, minute-by-minute, whether the car is on a public road or parked in a private garage. That means that the Fourth Amendment, in their view, has nothing at all to say about the reasonableness of the surveillance. If the Fourth Amendment is out of the picture, then it makes no difference whether a police officer subjectively had a good reason to activate a device that he attached, if he acted on a whim, or if he was systematically using devices put on every car in a bad part of town to see where the drivers might be going. The best analogy is to the lack of regulation of the situation in which a police officer approaches a person on a public street and asks a question. The officer might be asking the question because she is bored, because she finds the bystander attractive, because she forgot to wear her watch and is wondering what time it is, because she is suspicious of all persons of a particular ethnic descent, or because the person is behaving suspiciously. Her motivation is utterly irrelevant, as long as the encounter does not go beyond a consensual exchange of words. See United States v. Childs, 277 F.3d 947, 949 (7th Cir.2002) (en banc). The same is true of GPS devices, under the majority’s rule. Police officers could cruise the parking lots of shopping malls or the streets in one of Chicago’s rougher neighborhoods, install GPSs randomly, and begin tracking any person they chose. As long as the Fourth Amendment has no application, nothing but the financial resources of the police department stands between the individual person and such tactics. I underscore this point at the outset because the majority does not apply any Fourth Amendment screen at all — not a “reasonable suspicion” rule, by comparison to Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and not the normal “probable cause” rule.
Recognizing that the majority, the concurrence, and I have no quarrel at the highest level of generality, I confine my observations here to decisions with a more direct bearing on our problem. At least five cases are pertinent: United States v. Knotts, 460 U.S. 276, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983), United States v. Karo, 468 U.S. 705, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984), Bond v. United States, 529 U.S. 334, 120 S.Ct. 1462, 146 L.Ed.2d 365 (2000), Kyllo v. United States, 533 U.S. 27, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001), and City of Ontario v. Quon, — U.S. -, 130 S.Ct. 2619, 177 L.Ed.2d 216 (2010). After reviewing them, I turn to this court’s opinion in Garcia and the D.C. Circuit’s opinion in Maynard.
In Knotts, the Supreme Court considered whether the Fourth Amendment required the police to secure a warrant before they could install a beeper in a drum containing chloroform, in order to trace the movements of the drum and thus find out where a suspected methamphetamine operation was located. The respondent, Knotts, did not challenge the installation of the device in the container; his complaint was limited to the government’s use of the radio signals that the beeper transmitted. By modern standards, the signals were not particularly strong. As the Supreme Court described it, the investigating “officers followed the car in which the chloroform had been placed, maintaining contact by using both visual surveillance and a monitor which received the signals sent from the beeper.” 460 U.S. at 278, 103 S.Ct. 1081. In evaluating this arrangement, the Court reaffirmed its holding in Katz to the effect that the Fourth Amendment’s reach does not turn upon either the presence or the absence of a physical intrusion into any given enclosure. Knotts, *288 460 U.S. at 280, 103 S.Ct. 1081 (quoting Katz, 389 U.S. at 353, 88 S.Ct. 507). The activities of the officers in Knotts’s case, the Court said, were no different from ordinary visual surveillance along the route that the driver of the car took. Id. No one could have thought otherwise: the officers were tailing the car, and the only effect of the beeper was to transmit more information to them than their unassisted eyes and ears could have gathered. Although the Court recognized that the officers visually lost track of the car for a short period of time and were able to locate it again only by using the signal from the beeper, it found this fact immaterial because the officers could have tracked the car “relying solely on their naked eyes.” Id. at 285, 103 S.Ct. 1081. The Court dismissed Knotts’s slippery-slope argument with the following comment:
[Knotts] expresses the generalized view that the result of the holding sought by the Government would be that “twenty-four hour surveillance of any citizen of this country will be possible, without judicial knowledge or supervision.” Brief for Respondent 9 (footnote omitted). But the fact is that the “reality hardly suggests abuse,” Zurcher v. Stanford Daily, 436 U.S. 547, 566 [98 S.Ct. 1970, 56 L.Ed.2d 525] (1978); if such dragnet-type law enforcement practices as respondent envisions should eventually occur, there will be time enough then to determine whether different constitutional principles may be applicable. Ibid.
Id. at 283-84, 103 S.Ct. 1081 (emphasis added).
The Court returned to this topic only a year later in Karo. There, it addressed two questions that Knotts had left open: the first dealt with the installation of the beeper device, and the second was “whether monitoring of a beeper falls within the ambit of the Fourth Amendment when it reveals information that could not have been obtained through visual surveillance.” 468 U.S. at 707, 104 S.Ct. 3296. Interestingly, the government had obtained several court orders in the case, including one authorizing the installation and monitoring of the beeper in a container of ether that was destined to be used in a cocaine operation. As the case reached the Supreme Court, however, concerns with these orders led the Court to assume that both the installation and monitoring were handled without a warrant. The installation itself was of no interest: federal authorities had placed it in their own container, and they later substituted that container for one of respondent Karo. As in our case, the hard question related to the agents’ monitoring. As the Court put it, “[i]t is the exploitation of technological advances that implicates the Fourth Amendment, not their mere existence.” Id. at 712, 104 S.Ct. 3296.
Knotts, the Court underscored, had been a case in which both the movements of the automobile and the arrival of the container could have been observed by the naked eye. Id. at 713, 104 S.Ct. 3296. In contrast, Karo “presented] the question whether the monitoring of a beeper in a private residence, a location not open to visual surveillance, violates the Fourth Amendment rights of those who have a justifiable interest in the privacy of the residence.” Id. at 714, 104 S.Ct. 3296. Providing a helpful illustration that demonstrated the limits of the Knotts holding, the Court answered its own question in the affirmative and found a Fourth Amendment violation. In Karo, the reason why the key information could not have been obtained through visual surveillance was because it was collected inside a private residence to which the agents had no lawful access. That is the reason why the Court paid particular attention to the sanctity of the home, but its later comments *289 make clear that it was not establishing a rule limited to in-home searches. To the contrary, it squarely rejected the government’s argument that “traditional justifications for the warrant requirement are inapplicable in beeper cases.” Id. at 717, 104 S.Ct. 3296. “[T]o a large extent,” the Court continued, “that argument is based upon the contention, rejected above, that the beeper constitutes only a minuscule intrusion on protected privacy interests.” Id.
Any doubt that the Fourth Amendment continues to have force outside the home should have been put to rest by the Supreme Court’s decision in Bond. In that case, the Court held that a Border Patrol agent’s physical manipulation of a bus passenger’s carry-on suitcase, which had been placed openly in the overhead compartment of a common-carrier bus, violated the constitutional prohibition against unreasonable searches. 529 U.S. at 335, 120 S.Ct. 1462. The government had argued that by exposing his bag to the public Bond lost any reasonable expectation of privacy in it. Id. at 337, 120 S.Ct. 1462. In rejecting that position, the Court focused on how intrusive, as a practical matter, the invasion of privacy was. A “probing tactile examination,” id., of the carry-on luggage was more intrusive than a normal person would expect. The agent’s action, the Court concluded, violated the Fourth Amendment.
The Court demonstrated in Kyllo that it has not consigned Karo and Bond to the dustbin. Kyllo presented the question whether the Fourth Amendment was violated by law enforcement’s use of a thermal-imaging device aimed at a private house from a public street with the purpose of investigating whether the heat being emitted from the house was consistent with an illegal marijuana-growing operation. Like the beepers in Knotts and Karo, and like the GPS system used in Cuevas-Perez’s case, the thermal-imaging device took advantage of new technology to enhance the observational powers of the police. Writing for the Court, Justice Scalia began his analysis with the observation that “the antecedent question whether or not a Fourth Amendment ‘search’ has occurred is not so simple under our precedent.” 533 U.S. at 31, 121 S.Ct. 2038. For the search of a home, he continued, the analysis is no longer tied to common-law trespass. Id. at 31-32, 121 S.Ct. 2038. And, demonstrating a cautious, case-by-case, approach to the matter, the Court noted that it had “previously reserved judgment as to how much technological enhancement of ordinary perception” from a vantage point on a public street “is too much,” if it is the home that is being searched. Id. at 33, 121 S.Ct. 2038. It concluded as follows:
Where, as here, the Government uses a device that is not in general public use, to explore details of the home that would previously have been unknowable without physical intrusion, the surveillance is a “search” and is presumptively unreasonable without a warrant.
Id. at 40,121 S.Ct. 2038.
The last Supreme Court decision that is pertinent to our case is Quon, in which the Court had to decide whether a public employee had a reasonable expectation of privacy in text messages that he sent and received on a pager that his employer owned and had issued to him. In the end, it found in favor of the employer, but it refrained from making any sweeping statements. As before, the Court chose instead a measured approach, commenting that it had to “proceed with care when considering the whole concept of privacy expectations in communications made on electronic equipment owned by a government employer. The judiciary risks error *290 by elaborating too fully on the Fourth Amendment implications of emerging technology before its role in society has become clear.” 130 S.Ct. at 2629. The Court also acknowledged that “(Yjapid changes in the dynamics of communication and information transmission are evident not just in the technology itself but in what society accepts as proper behavior.” Id. Importantly, the Court did not assume that the. potential of new technologies to threaten privacy inevitably lessens reasonable privacy expectations. To the contrary, the Court emphasized that this was an open question, noting that the pervasiveness of cell phone and text messaging technology “might strengthen the case for the expectation of privacy.” See Quon, 130 S.Ct. at 2630. It is notable for our purposes that it made this point not in a case involving a search within a home, but in a case involving Fourth Amendment rights in a public workplace. In the end, the Court assumed for the sake of argument that the employee did have a reasonable expectation of privacy in his text messages and that the employer’s review of a transcript of the messages amounted to a search for Fourth Amendment purposes. It found, however, that the search was justified by the special needs of the workplace and was not excessive in scope, and so it found no constitutional violation. Id. at 2632. •
Before turning to this court’s decision in Garcia and the relevant part of the D.C. Circuit’s decision in Maynard, it is worth underscoring several points that emerge from the Supreme Court’s cases. First, contrary to the assumption in the concurring opinion, the Court has never considered the Fourth Amendment implications of the kind of GPS device that was used in Cuevas-Perez’s case — a device whose capabilities are so far beyond anything the Court saw in Knotts that we have difference in kind, not just a difference in degree. There is thus no escaping the question of how to extend these earlier Supreme Court rulings to a new situation. See Quon, 130 S.Ct. at 2635 (Scalia, J., concurring) (“Applying the Fourth Amendment to new technologies may sometimes be difficult, but when it is necessary to decide a case we have no choice.”). This is therefore not a case like State Oil Co. v. Khan, 522 U.S. 3, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997), in which a lower court has before it an old question (there, whether maximum resale price maintenance agreements are subject to antitrust’s per se rule of illegality) that the Supreme Court had long since resolved. Second, the Court itself has emphasized repeatedly the contextual nature of the Fourth Amendment inquiry. It has eschewed rigid rules, especially (as both Kyllo and Quon illustrate) where new technologies are involved. And, taken together, even Knotts and Karo show that certain uses of beepers (and by extension successor technologies that perform similar functions) may infringe legitimate expectations of privacy sufficiently to trigger Fourth Amendment protections.
In Garcia, this court was asked to decide whether the initial placement without a warrant of a GPS tracker on the defendant’s car violated his Fourth Amendment rights. At the time the device was affixed, the car was parked on a public street; the court assumed that it was also on a public street when the police retrieved it. Contrary to the majority’s suggestion, see ante at 274 n. 2, the defendant did not make a separate argument focusing specifically on the monitoring made possible by the GPS unit. (The majority implies that it would have been almost silly to distinguish between the attachment of the device and its later activation and use for monitoring, but I find nothing absurd in such a distinction. The line of cases I have just reviewed *291 plainly shows that privacy interests are normally triggered through monitoring, not through the simple installation of the device that the police use. And it is routine for this court to refuse to reach out and decide issues that are not pressed by the parties.) In Garcia, we said that the GPS device was a substitute for an activity — following a car on a public street— that is not protected by the Fourth Amendment, and that the use of the GPS tracker did not transform that activity into something illegal. 474 F.3d at 997. Even so, we acknowledged that the new technologies differ significantly from the older ones used by the police. “The new technologies enable, as the old (because of expense) do not, wholesale surveillance.” Id. at 997-98. We therefore recognized that certain uses of GPS devices, such as mass surveillance, might raise a question under the Fourth Amendment. The Garcia opinion hints, interestingly, that individualized suspicion may differentiate what is permissible under the Fourth Amendment from “mass surveillance.” Id. at 998. The police of Polk County, we said, had “abundant grounds for suspecting the defendant.” Id. For all of those reasons, we rejected the defendant’s challenge to the use of the GPS device.
Of the several cases around the country that have arisen in this area, the most thoroughly reasoned is that of the D.C. Circuit in Maynard. There, just as in Garcia, the court had to decide whether evidence acquired through the warrantless use of a GPS device should have been suppressed. The police had attached the device to defendant Jones’s Jeep without first obtaining a warrant. They then proceeded to track the defendant’s movements 24 hours a day for four weeks. Judge Ginsburg’s opinion for the court began by distinguishing this kind of search from the one that the Supreme Court had considered in Knotts. Maynard, 615 F.3d at 556. He pointed out that the careful language in Knotts that reserved for future consideration the constitutionality of more extensive searches was not limited to the mass-surveillance problem. To the contrary, the Court was also addressing “the defendant’s argument that, if a warrant is not required, then prolonged ‘twenty-four hour surveillance of any citizen of this country will be possible, without judicial knowledge or supervision.’ ” Id. (quoting Knotts, 460 U.S. at 283, 103 S.Ct. 1081). The GPS device in Maynard, the court found, exposed information about the defendant to the public that would not otherwise have been discovered:
Two considerations persuade us the information the police discovered in this case — the totality of Jones’s movements over the course of a month — was not exposed to the public: First, unlike one’s movements during a single journey, the whole of one’s movements over the course of a month is not actually exposed to the public because the likelihood anyone will observe all those movements is effectively nil. Second, the whole of one’s movements is not exposed constructively even though each individual movement is exposed, because that whole reveals more — sometimes a great deal more — than does the sum of its parts.
615 F.3d at 558. “Prolonged surveillance,” it concluded, “reveals types of information not revealed by short-term surveillance, such as what a person does repeatedly, what he does not do, and what he does ensemble.” Id. at 562. Continuing, the court found that “[a] reasonable person does not expect anyone to monitor and retain a record of every time he drives his car, including his origin, route, destination, and each place he stops and how long he stays there.... In this way the extended *292 recordation of a person’s movements is, like the ‘manipulation of a bus passenger’s carry-on’ canvas bag in Bond, not what we expect anyone to do, and it reveals more than we expect anyone to know.” 615 F.3d at 563 (quoting Bond, 529 U.S. at 339, 120 S.Ct. 1462). Finally, following such decisions as Katz, Bond, and Kyllo, the court concluded that the defendant’s expectation of privacy (in the sense of freedom from prolonged GPS monitoring) was objectively reasonable. Id. at 563-64.
II
In many ways, Cuevas-Perez’s case bears a strong resemblance to Maynard. Agents of Immigration and Customs Enforcement (“ICE”), working with the Phoenix police department, watched CuevasPerez’s movements for several days, because they believed that he was smuggling cocaine. After a camera revealed that he was fiddling around with the hatch and rear door panels of his Jeep SUV, they decided to attach a battery-powered GPS unit to the vehicle. Their intention was to see where Cuevas-Perez went and to try to develop evidence supporting their suspicions. In other words, at the critical time (as events were unfolding, in preparation for their planned surveillance), they intended to leave the GPS device on the car for an indefinite period of time and conduct a search, just as the agents in Maynard did. (To the extent that the court in Maynard might be understood as taking an ex post view of the reasonableness of the surveillance, I must respectfully disagree with it. The need for a warrant must be ascertained at the outset, not with the hindsight of two days’ or four weeks’ experience. See United States v. Grubbs, 547 U.S. 90, 95, 126 S.Ct. 1494, 164 L.Ed.2d 195 (2006). I note as well that the concurring opinion, ante at 278, criticizes my position for focusing on the intent of law enforcement at the time the device was affixed. But that is always the time when the need for a warrant or other justification for a search is ascertained. The search that follows after the warrant is issued — or in this case the surveillance that followed after the installation of the device — gives rise to an actual invasion of privacy, not a potential one.)
The GPS unit that Detective Matthew Shay attached to Cuevas-Perez’s Jeep was, as the majority concedes, designed to provide constant real-time information about the location of the vehicle to the monitoring officer. Using satellite technology, it would send a text message pinpointing where the vehicle was to the mother computer as often as once every minute. The unit could be, and was, monitored from the comfort of the police officer’s desk computer. Hoping to conserve battery life, Detective Shay decided to program it to provide location information only once every four minutes. With this information, the detective had exactly the kind of detailed information about CuevasPerez’s movements as the authorities did in Maynard. (Interestingly, and contrary to the majority’s assumption, the surveillance was not necessarily limited to his movements on public roads. Cars are commonly driven and parked on private property, and many popular vehicles like Cuevas-Perez’s Jeep are used off-road. This is just another way in which the GPS empowers the police to conduct much more intrusive surveillance than they could manage with earlier technologies.) The only difference between the two cases is that the battery in the device used on CuevasPerez’s Jeep did not last as long as Detective Shay had expected. At the time Shay realized this, Cuevas-Perez had driven quite a distance, through Arizona, New Mexico, the Texas panhandle, Oklahoma, Missouri, and part of Illinois. To the extent that it is relevant, the majority’s as *293 sertion that Cuevas-Perez’s movements in this case can be categorized as a “single journey” under Maynard’s reasoning, see ante at 274-75, is simply untenable. A commonsense definition of a “single journey” encompasses, as the D.C. Circuit observed, a trip from one’s home to the market, not a 60-hour odyssey across 1,650 miles as was the case here. See 615 F.3d at 560. More to the point, for all we know, Shay may have intended to monitor the Jeep for the same four-week period that the D.C. Circuit evaluated in Maynard. It would not be the first time that police conducted extended surveillance of a drug dealer to find out who else was involved in the illegal activity. But that option disappeared along with the battery life.
Hoping to salvage the operation, Shay got in touch first with the Missouri police and then with the Illinois State Police and asked for assistance. ICE agents asked the Illinois police to stop the vehicle, if they could develop independent probable cause to do so (in other words, if they could catch Cuevas-Perez in any kind of traffic violation). And that is just what the Illinois State Police did. Trooper Faulkner found Cuevas-Perez in the passing lane and arrested him for failing to return to the right lane within a reasonable time, as required by 625 ILCS 5/11— 701. The rest is history. A trained dog alerted to the presence of illegal drugs; officers searched the Jeep and found the heroin; Cuevas-Perez was arrested; and this criminal prosecution followed.
Ill
The lesson that I draw from the governing law that I have reviewed, as applied to the facts of Cuevas-Perez’s case, is that the police should have obtained a warrant before they activated the GPS device that they had affixed to the Jeep and began monitoring it. As I have already explained, this does not require us to revisit the holding of Garcia, since that case involved only the act of placing the GPS device on a car that was out in public. I agree with my colleagues that cases such as Karo direct us to find that the simple attachment of a device on an unattended car out in public is not invasive enough to trigger the warrant requirement. 468 U.S. at 712, 104 S.Ct. 3296 (observing that “a policeman walking down a street carrying a parabolic microphone capable of picking up conversations in nearby homes” does not engage in a search when the microphone is off). The monitoring, however, is qualitatively different, as we can see from the closely analogous line of cases dealing with wiretapping.
Recall that the issue in Katz concerned electronic surveillance of a telephone conversation through modernized wiretap technology. In overturning Olmstead v. United States, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928), the Court concluded that the “Government’s activities in electronically listening to and recording the petitioner’s words violated the privacy upon which he justifiably relied ... and thus constituted a ‘search and seizure’ within the meaning of the Fourth Amendment.” Katz, 389 U.S. at 353, 88 S.Ct. 507. How the wiretap was installed, Katz held, and whether it involved a trespass, no longer determined whether the government had conducted a search. Only a few months earlier, the Court in Berger v. New York, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967), had invalidated on Fourth Amendment grounds a New York statute authorizing the use of wiretaps. There, the Court observed that “[f]ew threats to liberty exist which are greater than that posed by the use of eavesdropping devices.” Id. at 63, 87 S.Ct. 1873. Noting the widespread use of wire *294 taps by law enforcement authorities, the Court counseled that “techniques and practices may well be developed that will operate just as speedily and certainly and — what is more important — without attending illegality.” Id. These cases recognize that the monitoring of private communications — even a conversation in a public phone booth discussing unlawful activity— invades an individual’s reasonable expectation of privacy. See Katz, 389 U.S. at 348, 88 S.Ct. 507. The next year, Congress passed Title III of the Omnibus Crime Control and Safe Street Act of 1968 to regulate wiretapping activity in accordance with Fourth Amendment principles. All of this built on the foundation the Court laid in Katz, and so it is to that foundation I believe we should turn in the present case.
Prolonged GPS surveillance, like a surreptitious wiretap, intrudes upon an individual’s reasonable expectation of privacy by revealing information about her daily trajectory and patterns that would, as a practical matter, remain private without the aid of technology. This sort of constant monitoring at a personal level gives rise to precisely the “dragnet” effect the Supreme Court identified in Knotts and decried years earlier in Berger. See Berger, 388 U.S. at 65, 87 S.Ct. 1873 (Douglas, J., concurring) (“The traditional wiretap or electronic eavesdropping device constitutes a dragnet, sweeping in all conversations within its scope.... It intrudes upon the privacy of those not even suspected of crime and intercepts the most intimate of conversations.”). An officer’s monitoring of a person’s every movement, as revealed by a GPS tracking device, is comparable to the monitoring of phone lines to intercept that person’s telephone conversations. In my view, both qualify as a search under the Fourth Amendment and both require the government to secure a warrant before the surveillance begins (or to show that an independent exception to the warrant requirement applies). As it did in the wiretap context, Congress could of course enact legislation to regulate GPS surveillance.
To conclude that open-ended, real-time GPS surveillance is not a “search” invites an unprecedented level of government intrusion into every person’s private life. The government could, without any metric of suspicion, monitor the whereabouts of any person without constitutional constraint. Under the majority’s view, such surveillance is tolerable. And because the Fourth Amendment protects individual rights, see District of Columbia v. Heller, 554 U.S. 570, 128 S.Ct. 2783, 2790, 171 L.Ed.2d 637 (2008), it is not clear why the use of GPS technology for mass surveillance would trigger the warrant requirement if the suspicionless surveillance of an individual does not. Thus, not only is the indefinite GPS surveillance of a single person permissible; the government could also keep tabs on entire communities, perhaps with the hope of identifying hints of criminal conduct. Under the majority’s framework, GPS tracking of all cars in a high-crime area is as unremarkable as an officer on the beat posing a polite question to a local resident. All of this can occur solely at the whim of a governmental actor, and there would be no requirement to demonstrate any suspicion of wrongdoing to a neutral magistrate.
The irony here is that the police may well have had probable cause to conduct this intimate surveillance of Cuevas-Perez, based on the investigation they had already conducted. Applying the principles from the wiretap cases to the situation before us, we should recognize that a “search” for Fourth Amendment purposes was taking place from the moment when the police began monitoring this particular GPS device' — one which, as I have stressed, was capable of transmitting min *295 ute-by-minute information, 24 hours a day. The approach that I propose avoids any inappropriate reliance on hindsight; it recognizes that GPS devices entail a level of intrusiveness on privacy expectations comparable to that of wiretaps; and it thus concludes that society should be prepared to recognize as reasonable the expectation that the police will not secretly be monitoring every movement of one’s car. Finally, my approach places no greater burden on the police to outline their reasons for the planned surveillance than they bear in wiretap cases. I conclude that Detective Shay conducted a search during the time when he used this particular GPS unit to monitor Cuevas-Perez’s location. Without a warrant, the search was unconstitutional.
I respectfully dissent.